ALBANY,
Feb. 1811.

THE PEOPLE
v.
JANSEN.

In an action brought against a surety on a bond given for the faithful discharge of the duty of a loan-officer under the act; (9th sess. c. 40.) it was held that the surety might set up in his defence the *laches* of the *supervisors*, in not discharging and prosecuting the loan-officer for his first default, but *,* suffering him to continue, after repeated defaults, for upwards of ten years, when the loan-officer became insolvent; and without prosecuting the officer as required by the act; and where no notice was taken of the defaults of the principal until after the death of the surety, this *laches* of the supervisors was held to be a good defence, especially in a suit against the heirs of the surety.

THE PEOPLE *against* JANSEN and others.

THIS was an action of debt on a bond executed by the father of the defendants, in his life-time, as one of the sureties of *Christopher Tappen*, one of the loan-officers of *Ulster* county, under the act of the 18th *April*, 1786. (1 *Greenleaf's* edit. of *Laws*, 240. 9th sess. c. 40.) The bond was to the plaintiffs, in the penal sum of 7,000 pounds, and in the form prescribed by the act. The defendants pleaded, 1. *Non est factum;* 2. *Non damnificatus*, and gave notice of special matter, to be offered in evidence at the trial.

The cause was tried at the *Ulster* circuit, in *September*, 1808, before Mr. Justice *Van Ness*.

The plaintiffs produced the bond, the execution of which was admitted, and the loan-office books of mortgages, the endorsement on which showed the amount of the moneys received for principal and interest.

The defendants read in evidence the acts of 18th *April*, 1786, (9th sess. c. 40.) the act of the 20th *February*, 1789, (12th sess. c. 29.) and the act of 9th *April*, 1795, (18th sess. c. 68.) relative to the loan-office.

The defendants then produced the minutes of the supervisors of the county of *Ulster*, as made by them, at their various meetings, in each year, from the year 1786 to the year 1804, during which time *Christopher Tappen* and *Joseph Gasherie* were the loan-officers, and no deficiency on their part appeared to have been taken notice of by the supervisors, until the year 1795; and no steps were taken by the supervisors to remove the loan-officers, and they were not removed, until *January*, 1804; though it appeared in evidence that the deficiency of the loan-officers began in 1791, and continued for several successive years. In *December*, 1798, the supervisors ordered suits to be commenced, on their bonds, against

5

the loan-officers, for their deficiencies, but they were not prosecuted, and the loan-officers were indulged from time to time, to make good their deficiencies, until the year 1803, when suits were again directed to be prosecuted against them.

Henry *Jansen*, the father of the defendants, and one of the sureties of *Tappen*, died in 1794. In the year 1798, *Tappen* was solvent and in good credit; and had the suit, ordered to be commenced against him, been prosecuted, with usual diligence, to judgment, the whole of the arrears might have been collected. He paid judgments to a large amount obtained against him since 1798.

A verdict was taken, by consent, for the plaintiffs, subject to the opinion of the court, on a case containing the above facts.

*Gardinier*, for the plaintiffs. Nothing but a performance of the condition of the bond, given by *Henry Jansen*, the ancestor of the defendants, or a release on the part of the plaintiffs, can exonerate the obligor or his heirs. A mere delay to sue, or suspension of a suit against the principal, will not discharge the surety. This is not the case of a suit between ordinary parties. It is brought on a bond to the people, and taken for their security.

The supervisors are public officers, and the record of their proceedings were, at all times, open to inspection. There was no concealment of the default of the principal; and the sureties cannot allege surprise, or ignorance of the *deficits* of their principal.

If the court should decide in favour of the plaintiffs, we contend they will also be entitled to interest.

*Sudam* and *Harison*, contra. The people, by their act, delegated to the supervisors and judges of the counties, in regard to the loan-officers and their sureties, all the

authority of the people, and the plaintiffs must, con-
sequently, be bound by the acts of their agents. The
sureties must be supposed to have executed the bond, on
the faith that the supervisors would do their duty, in re-
gard to the loan-officers.

By the 8th section of the act, (9th sess. c. 40.) the su-
pervisors were empowered to put the bond in suit when-
ever it became forfeited; and they are required, (15th
section,) in case of any neglect or refusal of any loan-
officer to perform his duty, to remove him, and appoint
another in his stead; and by the 28th section of the act,
they are directed to meet on the first *Tuesday* in *October*,
of every year, to inspect and examine the mortgages,
minutes and accounts of the loan-officers, and in case of
any neglect of the loan-officers, the supervisors are to
remove them. If, then, the supervisors performed the
duties required of them by the act, they must have known
of the deficiencies of *Tappen*, in 1791, 1792, 1793, 1794
and 1795, but of which no entry was made in their
books. Here was a fraudulent concealment of the de-
fault of the principal, for several successive years. The
sureties justly confided in the supervisors, the public
officers of the county, that they would do their duty;
and if, at the end of the year, either of the loan-officers
should be found guilty of a default, that he would be
removed. They never could imagine, that they should
be made responsible, after the lapse of ten years, when
the supervisors, knowing of the default, continued him
in office, and passed over his defaults for several suc-
cessive years, without notice. It was the duty of the
supervisors to give notice to the surety, of the default of
the principal. *Tappen* was solvent in 1798, and possess-
ed sufficient estate to indemnify the people, had he been
prosecuted with due diligence. The surety died in 1794,
and his heirs could not know of the situation of the suit
in 1798. The defendants are, therefore, injured by the
delay and neglect of the supervisors.

* 1 Bos & Pul.
440.

The case of *Peel and others* v. *Tatlock*,* shows that a

surety will not be liable, if the default of the principal has been concealed from him.

ALBANY,
Feb. 1811.

THE PEOPLE
v.
JANSEN.

* 2 *Vesey,* jun.
540. 544.

In *Rees* v. *Berrington*,* Lord *Loughborough* held, that where an obligee in a bond, with the knowledge of the surety, took notes of the principal, and gave further time of payment, the surety was discharged ; and Lord *Thurlow* held, where a bond was put in suit, at the request of the surety, and judgment recovered, but the creditor, without the privity of the surety, agreed to stay execution, the surety was discharged.

Though a court of equity would relieve the defendants, it does not follow that a court of law will not also relieve them, when the facts are such as clearly entitle them to relief. It is true, Lord *Ellenborough*, in the case of *The Trent Navigation Company* v. *Harley*,† said, he did not know that the *laches* of the obligees, in not calling upon the principal, as soon as they might have done, had the accounts been properly examined, from time to time, could operate as an estoppel at law, whatever it might in equity. But there is no reason why a surety, where the facts are ascertained, should be driven into a court of equity for relief.

† 10 *East*, 34.

There is no distinction between sureties for officers of government, and any other sureties. The ground on which the defendants claim relief, is the gross and wilful *laches* of the supervisors, from year to year. Where persons, who have the control and management of the contract or subject, give time to the principal, it discharges the surety. It shows that they do not rely on the surety, but look to the personal responsibility of the principal.

At all events, the defendants cannot be answerable for interest or damages, in a case where the delay is entirely owing to the plaintiffs' own negligence. Sureties are always favoured in law.

*E. Williams,* in reply. The defence set up in this case

is unknown to a court of law. This was the opinion of Lord *Ellenborough*, in the case which has been cited. That case is perfectly analogous to the present. If there is any defence at law, it must be either because there has been an enlargement of the time of payment beyond the condition of the bond, or a fraudulent concealment of the default of the principal. By an enlargement of the time of payment, I do not mean a mere indulgence on the part of the obligee, or a delay to prosecute, but giving a further term of credit, within which the principal could not be prosecuted. If a surety requests the obligee to sue the principal, and he refuses, it may, perhaps, be a good defence in equity; but the mere delay of a suit, without consulting the surety, has never been held a defence at law. Indulgence to the principal may, oftentimes, prove beneficial to the surety; and in the present case, by continuing *Tappen*, he was enabled to pay 2,000 dollars of his former deficiencies.

The case of *Peel* v. *Tatlock* fully supports the doctrine for which we contend; that mere indulgence or delay to the principal will not discharge the surety.

It is objected, that we did not give notice of the defaults prior to 1795; but it does not appear that the supervisors knew of any default prior to that time. The loan-officers and supervisors are the servants of the people, who might discharge them if they pleased; but they were not bound to discharge, and if they did not, it affords no defence to the defendants.

THOMPSON, J. delivered the opinion of the court. This is an action of debt upon the penalty of a bond given to the people of this state, (pursuant to the act of the 18th of *April*, 1786,) by the defendants' ancestor, as *security*, that *Christopher Tappen* should well and truly perform the office and duty of one of the loan-officers of *Ulster* county. The loan-officer having neglected to pay into the treasury the money by him received, and

having become *insolvent*, recourse is now had to his se-
curity. The case discloses that the deficiency of the
loan-officer began as early as the year 1791, and conti-
nued to increase almost every year until 1798, but he
was not removed from office until the year 1804. And
no entry of any deficiency was made in the minutes of
board of examiners of the loan-officers' accounts, until the
the year 1795. The defendants' ancestor died in the
year 1794, and in the year 1798 a suit was commenced
against the loan-officer, who was then solvent, but was
not prosecuted to judgment, nor were the arrears due
from him paid up and settled. Under these circum-
stances, the first question that arises, is, whether the de-
fendants can, in a court of law, avail themselves of these
facts in their defence. And if so, then whether they are
sufficient to exonerate them from the payment of the
loan-officer's deficiencies. I am unable to discover any
good reason for sending the defendants into a court of
chancery for relief. There is nothing in the nature of
the defence, to make it peculiarly a subject of equity ju-
risdiction. That the ancestor of the defendants was
a *surety* only, appears upon the face of the bond; and
whatever would exonerate the security in one court
ought also in the other. The facts being ascertained, the
rule of law must be the same in this court as in the
court of chancery. And this seems to be the light in
which the subject was viewed, in the case of *Rees* v.
*Barrington*, (2 *Vez.* jun. 542.) The doctrine of this
case clearly is, that whether a surety has been discharged
or not, is a legal principle, and that, if the form of the
security and mode of proceeding at law, would authorize
an inquiry into the fact, whether security or not, the de-
fence would be the same at law as in equity. Lord
*Loughborough* says, it is the form of the security that
forces these cases into equity. For where the principal
and security are bound jointly and severally, the security
cannot aver, by pleading that he is bound as surety;

but if he could establish that at law, the rule or principle by which his liability is to be determined is a legal principle. The case of *The Trent Navigation Company* v. *Harley*, (10 *East*, 34.) does not appear to me essentially to impugn this doctrine. The *laches* of the plaintiffs in that case, on which the security relied for their exoneration, was disclosed by special pleas, on which issues were taken. If the defence set up had not been available at law, a demurrer would probably have been interposed. But the parties went to trial upon the facts. And the court say, in their judgment, upon the motion for a new trial, that none of the pleas appear to have been proved. It is true, Lord *Ellenborough* says, the question is, whether the *laches of the obligees, in not calling upon the principal as soon as they might have done*, if the accounts had been properly examined from time to time, be an estoppel at law against the sureties. And he adds, I know of no such estoppel at law, whatever remedy there may be in equity. If the position here intended to be laid down is, that mere delay in calling on the principal, will not discharge the surety, it is, I think, a sound and salutary rule, both at law and in equity. In the case of *Peel* v. *Tatlock*, in the C. B. (1 *Bos. & Pull.* 419.) where the *laches* of the plaintiff was relied upon by the guarantee, in discharge of his responsibility, it was never suggested that this was not a defence at law; and it was submitted to the jury as a question of fact, whether, under the circumstances appearing in evidence, the plaintiff had not waived the guaranty, and exonerated the defendant. That the defence set up in the case before us ought to be admitted in a court of law, appears to be fortified by the consideration, that this is a bond of indemnity under a penalty; and which, under the statute, requires an assignment of breaches. The occasion of this statute was, to moderate the rigour of the common law, which drove parties into equity for relief against the penalty; and since the statute, courts

of law have the same jurisdiction, in this respect, as the court of chancery had before. The defence, therefore, in my opinion, is admissible at law, and the effect and validity of it, forms the next subject of our inquiry.

The verdict has been taken by consent of parties, subject to the opinion of the court, upon the facts stated. So that, if any part of the defence was a subject proper for the consideration of a jury, that is waived by the form in which the case is presented. This case differs essentially from the ordinary case of a security in a bond to a private individual. In such case the obligee is under no positive injunction, or legal obligation, to watch over the conduct of his principal debtor, and at stated periods to examine into his accounts, and in case of failure in punctual payment, to adopt measures calculated to relieve the security. The risk of the insolvency of the principal is assumed by the surety, and the liability of the latter continues, unless he should, at least, require of the creditor to enforce payment. But the situation of the security in this case is widely different. The statute under which the bond was taken, makes it the duty of the supervisors in each county, together with one or more of the judges of the common pleas, annually to meet, and carefully to inspect and examine the minutes and accounts of the loan-officers, and if it be found that any loan-officer has refused or neglected to perform the duty enjoined upon him, they are directed to elect another in his stead. The security had a right to look to the provisions of this statute, and to calculate his liability, on the presumption that the duties enjoined on these public officers would be faithfully and punctually discharged ; and if so, that he could in no event be responsible for more than one year's deficiency. There can be no doubt that the plaintiffs are chargeable with the consequences of the neglect, or breach of duty of their agents or public officers, intrusted with this business.

I should have no doubt but the defendants would be

responsible for the first year's deficiency of the loan-officer, had the judges and supervisors complied with the duty enjoined upon them by the statute, and removed him from office. This, however, they did not do, until twelve or thirteen years after, when the loan-officer had become insolvent. The defendants are not chargeable with notice of these deficiencies. There is no evidence that they knew their ancestor was surety for the loan-officer. The minutes of the judges and supervisors, which are public records, might have charged the ancestor with this knowledge, had those minutes shown the deficiency during his life-time. But that was not the case. The ancestor died in the year 1794, and although the first deficiency was in the year 1791, there is no entry of any default on the minutes until the year 1795. This is another circumstance calculated to mislead and lull the security to sleep. Again, in the year 1798, a suit was commenced against the loan-officer, at which time he was solvent, and able to have paid all arrears. Indulgence, however, was from time to time given, and the suit not prosecuted to effect, or the arrears paid up. This was a violation of the spirit and intention of that clause in the statute which directs that suits on bonds given by the loan-officers should be staid on the defendant's paying or tendering the damages which had arisen by the breach of the condition of the bond, together with the costs due. These circumstances are sufficient to show beyond a doubt, that the neglect and indulgence of the judges and supervisors, in direct violation of the duty imposed upon them by the statute, have occasioned the loss. And it would be extremely hard and unjust to permit a recovery against the surety, in the face of such repeated *laches*. In the case of *Peel* v. *Tatlock*, (1 *Bos. & Pull.* 422.) *Buller*, J. says, if any new debt be incurred, or the demand enlarged, it might be a fraud on the guarantee. And he seems to admit, as a general rule, that if any thing be done between the

creditor and principal debtor, which creates the injury to the surety, it will go in discharge of his responsibility. This is a just and equitable principle, and one which ought to be applied to the case before us.

We are, accordingly, of opinion, that the defendants are entitled to judgment.

Judgment for the defendants.